## WALTER RUSSELL HAWKINS *v.* STATE OF MARYLAND

[No. 211, September Term, 1976.]

*Decided December 3, 1976.*

The cause was argued before THOMPSON, MOYLAN and DAVIDSON, JJ.

*George E. Burns, Jr., Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Leroy Handwerger, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Daniel Cassidy, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

Walter Russell Hawkins, the appellant, was convicted of rape, false imprisonment, and the use of a handgun in the commission of a crime of violence by the Circuit Court for Prince George's County. The jury also specifically found him to have been sane at the time of the offenses. Judge Joseph A. Mattingly imposed sentences totaling thirty-five years. On appeal the appellant contends the trial judge failed to require the proper order of proof, that the evidence was insufficient to support the finding of sanity, and that the trial judge erred in denying a new trial and in failing to merge the crimes of false imprisonment and rape.

The victim testified that on May 21, 1974, she was waiting in a wooded area for a friend when the appellant approached her. After a brief conversation, he seized her by the throat and held a gun to her side. She was ordered to disrobe and lie on the ground; whereupon her assailant engaged in sexual intercourse with her without her consent. The defense introduced no evidence denying either the crime or the criminal agency, but after the conclusion of the State's case

produced a psychiatrist who testified, out of the presence of the jury, that in his opinion the appellant was insane at the time the crime was committed. The trial judge ruled that the issue of insanity was presented, and the appellant proceeded to introduce, before the jury, his evidence tending to show that he was insane at the time the crime was committed. The State produced evidence tending to show that he was sane at the time.

Dr. Irving L. Berman, a psychiatrist, testified that he had evaluated the appellant on the basis of a one hour interview on September 19, 1975 and upon examination of the reports and tests from Clifton T. Perkins Hospital. It was his opinion that the appellant was "suffering from chronic undifferentiated schizophrenia" and because of this mental disorder Hawkins lacked the ability to conform his conduct to the requirements of the law. Dr. Irwin J. Papish testified that he had interviewed the appellant on September 10, 12, and October 6, 1975. Based on the interviews, tests, and reports supplied by Clifton T. Perkins Hospital he concluded:

"What I found was that for many years he has been suffering from both visual and auditory hallucinations. These are hearing things that are not real and seeing things that are not real. He has also tended to have suspicious, somewhat paranoid feelings about other people; that they would again have some malice or hostility or ill will towards him. And this has been a feature of his illness."

"I would state that I think he had some impaired capacity to appreciate the criminality of his conduct, but that he very definitely was substantially impaired as to his ability to conform his conduct to the requirements of the law."

Appellant's wife, brother, and cousin testified for the defense stating that Hawkins had suffered from hallucinations and delusions since he was 14 or 15 years of age. (He was 25 at the time the crime was committed.)

A report to the court from the Clifton T. Perkins Hospital,

signed by Dr. Yavuz Inel, was introduced; it contained the following paragraph:[1]

"Our evaluation disclosed a Full Scale I.Q. of 93 on the Wechsler Adult Intelligence Scale with no evidence of psychotic symptoms. Psychological examination disclosed adequate reality testing, inadequacy and lack of basic trust. Dr. Inel, Acting Superintendent and Dr. Aceituno, Staff Psychiatrist diagnosed the patient as Schizophrenia, Chronic Undifferentiated Type (in Remission) and felt that, at the time of the offenses, the patient's mental disorder was in a state of remission, and therefore, he was responsible for his actions. Dr. Mola, Staff Psychiatrist, diagnosed the patient as Schizophrenia, Chronic Undifferentiated Type and she offered the opinion that, at the time of the various offenses, the patient was suffering from Schizophrenia and, because of that, he was not responsible for his behavior. Dr. Adamo, Acting Clinical Director, found no evidence of Schizophrenia at this time or during the extended period at which time the alleged offenses occurred. His diagnosis was Schizoid Personality with Anti-Social Features. It was Dr. Adamo's further opinion that this patient has been attempting to malinger more serious psychopathology such as auditory and visual hallucinations since the age of sixteen. Dr. Inel also agreed that the patient is attempting to malinger a psychosis."

Dr. Ido Adamo testified on behalf of the State:

"A. It is my opinion that at the time of all the offenses he was not suffering from a mental disorder which could have caused him to lack substantial capacity to appreciate the criminality of

---

1. Dr. Inel's opinion concerning malingering was not included in the staff notes which he prepared, but was included in this report which was dictated by Dr. Adamo.

his conduct and to conform his conduct to the requirements of the law.

Q. Doctor, what was the opinion of Dr. Inel of your staff?

A. Dr. Inel agreed with my opinion.

Q. And how about Dr. Aceituno?

A. He also agreed.

Q. And Mrs. Mola?

A. Mrs. Mola gave a dissenting opinion. She felt that he was suffering from a schizophrenia and, therefore, he was not responsible.

Q. Doctor, in the Clifton T. Perkins report, Defense Exhibit No. 2, is there an admission note in there by Mrs. Mola?

A. On admission she happened to see this man when he first came on April 9th, and at that time she didn't find any evidence of a psychosis or schizophrenia or delusions. She felt he was a little depressed, non-committal. He didn't want to talk about the offenses, but she felt there was no evidence of psychosis. She gave the diagnosis of anxiety neurosis at that time. Then she changed her diagnosis.

Q. Doctor, in the report you state that the Defendant has schizoid personality with antisocial features. Would you please explain that diagnosis to the ladies and gentlemen of the jury?

A. That was my diagnosis and still is. Schizoid personality is a personality disorder. It refers to individuals who are somewhat shy, unable to relate well to other people to express their feelings, to show hostility openly. They are suspicious, they don't trust people. That is a schizoid personality. The antisocial features are because of the attitude with regard to the various offenses.

Q. Doctor, have you had an opportunity to sit in the courtroom today as an expert, with

the permission of the Court, and listen to some of the defense witnesses in this case?

A. Some of them, yes.

Q. And have you had an opportunity to speak with a Mr. George Shearard, a co-worker of the Defendant?

A. Yes, I did.

Q. And in your conversations with Mr. Shearard as to the Defendant's past conduct over the last five years, did that strengthen or weaken your diagnosis of the Defendant?

A. It actually reinforces my opinion that I stated very clearly in the letter — I personally dictated the report of the findings of the staff — that there was no evidence that this man has ever been showing clear signs of a psychosis. And in discussions with Mr. Shearard he indicated that he knew him for five or six years — he also is a mail carrier — and never at no time did he notice anything unusual or peculiar in the way he was talking, the way he was communicating with people, with himself, which confirms my own impression.

Q. Are you aware of the fact that the Defendant lived with his wife and two children for approximately eight and a half years?

A. That is correct, yes.

Q. How would that fact have a bearing on your opinion?

A. Well, it is some differences with my own colleagues at Perkins, some of them they actually gave a diagnosis chronic undifferentiated, although they felt he was in remission. And my opinion was that this man has never been documented or reported in a documented fashion as being a psychotic. He has been saying that he hears voices, he has

also visions since he was 16. He also has been saying that he becomes some other man within himself who controls him. Now, if a man, if any person develops this kind of symptoms which, as they are reported, they are very severe, very serious to require admission to a psychiatric facility, the individual would be unable to function with those symptoms. Those are symptoms of psychosis, not just schizophrenia. Schizophrenia, there can be some signs. But sometimes a schizophrenic patient can function within some limitations. But when a schizophrenic patient develops these gross secondary symptoms, such as hallucinations, they just can't function, cannot marry, cannot properly care for their families. They cannot function at work where they are staying for a period of time without drawing the attention of a psychiatrist, coming to the attention of a psychiatrist. That is why I objected to diagnosing this man as a schizophrenia, chronic undifferentiated type. Even the psychological testing, the psychological does not show this man has a psychosis. At the time of the testing, the psychological simply indicated that under stress this individual can develop something else. But it doesn't say that he will. He can; it is possible.

Q. Doctor, in your report you indicate that you felt the Defendant was malingering.

A. That is correct. The thinking, the way he communicated with us showed that he did not have a thinking disorder, which would be what we call a primary symptom. In order to have a secondary symptom, such as hallucinations, one must show signs of a primary disorder, which is basically in the thinking and the feelings. And he did not show those signs.

Therefore, in the absence of that, I felt that he was just saying that he hears the voices in order to exculpate himself from criminal responsibility.

Q. Doctor, did any of the other psychiatrists on the staff agree with your opinion as to the Defendant's malingering?

A. Dr. Inel agreed with me, although it is not stated in the staff notes."

*"Did the Trial Judge Abuse His Discretion in Permitting the Proper Order of Proof to be Violated?"*

At the conclusion of the State's case, appellant offered a motion for acquittal, arguing in effect that his plea was sufficient to raise the issue of insanity and the State had produced no evidence to prove that the appellant was sane. The trial judge denied the motion on the basis that no evidence of insanity had been produced, and therefore the State could at this point rely on the familiar presumption of sanity. Appellant does not contest that ruling on this appeal. After the motion to acquit was denied, appellant offered evidence outside the presence of the jury that appellant was insane at the time of the offenses. After the court ruled the evidence was sufficient to present an issue as to sanity, the appellant called upon the State to produce its evidence as to sanity. The court ruled the appellant had to present his evidence before the jury first, and then the State could produce its evidence on rebuttal.

Appellant argues that in *Bradford v. State*, 234 Md. 505, 512, 200 A. 2d 150 (1964), the Court of Appeals ruled that when the defendant produces evidence, sufficiently rebutting the presumption of sanity, it then becomes the State's burden to prove sanity beyond a reasonable doubt initially. We do not think *Bradford* supports the argument. In *Bradford* the Court was considering the question of whether once the issue of insanity is properly raised, does the State have the burden of proving, beyond a reasonable doubt, that the accused was sane, or, as in some states, must the defense prove, by a preponderance of evidence, that the

accused was insane. The court ruled that once the issue was properly raised the burden of proving sanity beyond a reasonable doubt was upon the State. It did not address itself to the order of proof, that is, who had to present evidence as to sanity or insanity to the jury first.

Appellant also relies on *Strawderman v. State*, 4 Md. App. 689, 244 A. 2d 888 (1968), *cert. denied*, 252 Md. 733, wherein we reiterated the rule, once the issue of insanity was properly raised the State must prove sanity beyond a reasonable doubt. We did not address ourselves to the issue raised here but did state that the evidence concerning the insanity should first be presented outside of the presence of the jury. We reiterated this holding in *Dennis v. State*, 13 Md. App. 564, 284 A. 2d 256 (1971), *cert. denied*, 264 Md. 747. Once again, we did not address the specific issue raised by the appellant. We have no difficulty in holding, however, the trial judge arrived at the proper conclusion. The rule requiring the defense to produce evidence of insanity initially outside of the presence of the jury is a means of avoiding confusion by precluding such evidence, before the jury, absent a contest as to sanity. The issue is not raised in the presence of the jury, the trier of the facts, until similar evidence is presented to them, and until that occurs, the State can perfectly properly rely on the presumption that all men are sane. *Bradford v. State, supra* at 509. Although the State presented no evidence as to sanity in this case in chief, the defense did present evidence as to insanity in its case. The State's evidence of sanity was therefore timely introduced in rebuttal. *Hepple & Jones v. State*, 31 Md. App. 525, 358 A. 2d 283 (1976), *cert. granted*, Sept. 15, 1976.

*"Was the Evidence Insufficient to Find the Appellant Sane Beyond a Reasonable Doubt?"*

We have set out, somewhat at length, Dr. Ido Adamo's testimony as to his opinion of the appellant's sanity at the time of the commission of the offense. In summary, his testimony was that despite some claim by the appellant and his relatives that the accused was a victim of delusions, it

was his opinion that the symptoms could not have been as bad as described; otherwise the appellant could not have led a normal family life for eight and one-half years, fathered two children and worked steadily for five and one-half years as a mail carrier. We repeat what we said in *Mahoney v. State*, 8 Md. App. 44, 50, 257 A. 2d 462 (1969), *cert. denied*, 257 Md. 734, "It was the function of the jury to resolve the conflicting evidence on the issue and the weight to be given it was a matter for them." *See also Avey v. State*, 9 Md. App. 227, 241 263 A. 2d 609 (1970), *cert. denied*, 258 Md. 725.

### *"Did the Trial Judge Abuse His Discretion in Refusing to Grant a New Trial?"*

In *Bremer v. State*, 18 Md. App. 291, 352, 307 A. 2d 503 (1973), *cert. denied*, 269 Md. 755, U. S. *cert. denied*, 415 U. S. 930, we stated:

> "The Court of Appeals has recently reaffirmed, in sure and certain language, the established principle that generally the ruling of the trial court on a motion for a new trial in a criminal case lies within the sound discretion of the trial court and cannot be reviewed on appeal, except, perhaps, when the judicial discretion is clearly abused. *State v. Devers*, 260 Md. 360, 373-381."

Appellant, to support his argument that the trial judge abused his discretion in denying a motion for a new trial, alleges that the evidence was insufficient to show sanity. As we have stated above, we find that it was sufficient, and thus this argument must fail. In addition, he argues that in three companion cases other courts had found the appellant insane at other times. We cannot say that this argument has any merit because it is entirely possible that he could have been insane at some time but not necessarily on May 21, 1974. The complete answer to appellant's objection is that there was sufficient evidence to support the finding of the jury; the trial judge did not see any manifest injustice, nor do we.

*"Was the Appellant Improperly
Convicted of False Imprisonment?"*

Under this argument the appellant alleges that his convictions of false imprisonment and rape should have merged. We agree. In *Moore v. State,* 23 Md. App. 540, 329 A. 2d 48 (1974), *cert. denied,* 274 Md. 730, this Court declined to merge kidnapping and rape where there was evidence that the victim was taken into the car and driven quite a distance prior to the time the rape occurred, reiterating a similar finding in *Rice v. State,* 9 Md. App. 552, 566, 267 A. 2d 261 (1970), *cert. denied,* 259 Md. 735. In the latter case we quoted the established rule from *Stewart v. State,* 4 Md. App. 565, 569, 244 A. 2d 452 (1968), wherein we stated:

> "The true test of merger under the modern doctrine is whether one crime necessarily involves the other, *viz.,* when the facts necessary to prove the lesser offense are essential ingredients in establishing the greater offense, the lesser offense is merged into the greater offense."

The facts of the instant case show the victim was detained only a sufficient time to accomplish the rape. False imprisonment does not require a carrying away, but simply an unlawful confinement. All of the facts necessary to prove the lesser offense were essential to proving the greater one and, therefore, the two offenses merged. *See* generally *Rice, supra.* To hold otherwise would be to hold that in every case of rape, a conviction for false imprisonment would also be proper. Of course, confinement after or before the rape is committed would preclude the merger.

*Judgment as to false
imprisonment vacated.
Other judgments affirmed.
Appellant to pay costs.*